## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| ERICA GARCIA, on behalf of T.G., a minor child,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | CASE NO. 3:24-CV-01240-JRK<br><br>JUDGE JAMES R. KNEPP II<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

### INTRODUCTION

Plaintiff Erica Garcia, on behalf of her minor son, T.G., challenges the Commissioner of Social Security's decision denying childhood supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. **§§** 1383(c) and 405(g). On July 22, 2024, under Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated July 22, 2024). Briefing was completed as of December 2024. (*See* ECF #9). Following review, and for the reasons below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the matter for further proceedings.

### PROCEDURAL BACKGROUND

Ms. Garcia, protectively applied for SSI on T.G.'s behalf on July 16, 2022, alleging he became disabled on March 25, 2021 due to attention deficit hyperactivity disorder (ADHD), speech delay, and fine-motor delay. (Tr. 67 190-91). The claim was denied initially on December 27, 2022 (Tr. 81) and on reconsideration on June 26, 2023 (Tr. 95).

1

On July 6, 2023, Ms. Garcia requested a hearing before an administrative law judge. (Tr. 102). On December 21, 2023, Ms. Garcia and T.G. (both represented by counsel) testified before the ALJ. (Tr. 37-66). On January 12, 2024, the ALJ determined T.G. was not disabled. (Tr. 17-32). On May 23, 2024, the Appeals Council denied Ms. Garcia's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. § 404.984(b)(2)). Ms. Garcia timely filed this action on July 22, 2024. (ECF #1).

## FACTUAL BACKGROUND

### I.     Personal Evidence

T.G. was born on May 15, 2014. (Tr. 18). Under Social Security regulations, he was a school-age child when the protective application was filed and as of the ALJ's decision. (*Id.*). He started second grade shortly after his July 2022 application date.

### II.    Educational Evidence

T.G. has an individualized education program (IEP) at school. As part of evaluating T.G. for his IEP, school psychologist Sheryl Burke observed T.G. in his kindergarten classroom on April 27, 2021. (Tr. 471). He sat in a wiggle seat with a weighted animal on his desk. (*Id.*). During lecture, T.G. was on target and oriented to the teacher, but during a written assignment, T.G. showed "off-task behaviors" like rolling his pencil on his desk and comparing the length of pencils. (*Id.*). She concluded T.G. had difficulty maintaining his focus, staying on task, and when frustrated, he could not focus. (Tr. 472). Ms. Burke administered the Kaufman Test of Educational Achievement, Third Edition ("KTEA-3") and the Wechsler Intelligence Scale for Children, 5th Edition ("WISC-V") on May 4, 2021. (Tr. 469-75). On the KTEA-3, T.G. had mixed scores within the low and average ranges on the various subtests. (*See* Tr. 470). The WISC-V suggested T.G.'s IQ was 96, in the average range. (Tr. 474). T.G. had mixed scores on the various subtests with one

2

high-average, three average, and two low-average scores. (Tr. 473-74). Ms. Burke noted T.G. had more difficulty recalling auditory information (Tr. 474), was not yet reading or sounding out simple words, was not yet demonstrating phonological processing skills, and could not write his own words to communicate though he could copy letters and words (Tr. 470).

On May 3, 2022, T.G.'s IEP was reviewed before he started second grade. (Tr. 458-68). T.G. was described as social child who typically interacts well with his peers and teachers and tries his best at school. (Tr. 459). But he still read and wrote below grade level despite making progress. (*Id.*). That deficit affected him across the curriculum. (*Id.*). He would become frustrated when reading, which caused him to shut down and refuse to work. (*Id.*). He has additional phonics and reading instruction with reduced spelling homework as well as accommodations allowing sensory breaks, extended time on tests, having tests read aloud, and taking tests in small groups. (Tr. 462).

On April 25, 2023, T.G.'s IEP was reviewed again before he started third grade. (Tr. 260-70). On his most recent reading test, he read at a first-grade level. (Tr. 261-62). He kept similar accommodations except his spelling list was increased from eight to ten words. (Tr. 266; *compare* Tr. 462). T.G.'s December 2023 report card reflected As and Bs except for a D in Bible studies. (Tr. 256).

III. **Medical Evidence**

On March 15, 2021, T.G. presented at University Hospitals and was diagnosed with an expressive-language delay, fine-motor delay, and hyperactivity. (Tr. 450). He was referred to speech and occupational therapy. (Tr. 450). At that time, more information was needed to properly diagnose for ADHD (*id.*) but it was listed by April 26, 2021 (Tr. 446). T.G. was prescribed five

milligrams extended-release Adderall[1] daily on March 25, 2021 (*see* Tr. 447) and it was increased to ten milligrams daily by April 26. (Tr. 446). At a follow-up visit on May 24, 2021, that dosage was maintained because by then T.G.'s "ADHD symptoms have significantly decreased at home [and] at school on [Adderall] 10mg." (Tr. 442). This dosage was maintained over several follow-up visits. (*See* Tr. 438 (Aug. 23, 2021), 434 (Nov. 15, 2021), 430 (Feb. 21, 2022), 426 (Aug. 15, 2022)). But around October 2022, the dosage was increased to 15 milligrams because it would wear off partway through the day. (*See* Tr. 510).

T.G. first presented at speech therapy on March 24, 2021, where he was diagnosed with an expressive language disorder. (Tr. 342). He had three goals in speech therapy: (1) to demonstrate appropriate kindergarten readiness skills in rhyming, letter and sound identification, and others; (2) to follow one-to-two-step directions while following concepts such as before, after, over, under, or prepositional phrases, with 80% accuracy; and (3) to complete language testing. (*Id.*). By December 21, 2021, Goal 2 and 3 were complete but Goal 1 was still progressing. (*See* Tr. 349-50). He could "identify and generate rhyming words" and continued working on segmenting words and phoneme blending. (Tr. 350). By March 28, 2022, T.G demonstrated "adequate progress with speech therapy." (Tr. 353). His progress note described T.G. as "following directions targeting age-appropriate concepts," "progressing with development of phonological awareness skills," and "generat[ing] rhyming words and counting syllables in a given word." (*Id.*). But T.G. was "still

---

[1]     T.G.'s medical records refer to "amphetamine-dextroamphetamine ER," an extended-release ADHD medication with a brand name of Adderall XR. *See Dextroamphetamine and Amphetamine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601234.html (last accessed April 24, 2025). For readability, I refer to it here as Adderall.

working on segmenting and blending" though his "accuracy with that is improving also." (*Id.*). He was still progressing on the same issues by April 6, 2022. (Tr. 373-74).

T.G. first presented at occupational therapy on July 13, 2021, where he was diagnosed with fine-motor delay, though a recent collarbone fracture hampered the diagnosis. (Tr. 357). He had four goals in occupational therapy: (1) improve visual- and fine-motor skills in writing his name; (2) use buttons, zippers, fasteners, and shoelaces on his own; (3) give fair attention to age-appropriate seated games and activities; and (4) Ms. Garcia would have home-sensory strategies for T.G. (Tr. 368-69). By December 16, 2021, all four goals were met and T.G. was discharged from therapy. (Tr. 371-72).

On May 4, 2023, T.G. underwent a speech-language evaluation as part of his disability application. (Tr. 504). His expressive/receptive language skills and articulation both "fell within normal limits" though he scored below the mean scores for the tests. (Tr. 505). He also had some articulation errors. (*Id.*). All other examinations conducted were "within normal limits." (*Id.*).

## IV.    Opinion Evidence

### A.    State agency reviewers

On November 16, 2022, state agency reviewing medical pediatrician Obiaghanwa Ugbana, M.D., and psychologist Karla Delcour, Ph.D., conducted the initial review. They opined T.G. had a "marked" limitation for acquiring and using information; a "less than marked" limitation for attending and completing tasks, interacting and relating with others, and moving about and manipulating objects; and no limitations in caring for oneself and health and physical well-being. (Tr. 70-71).

On June 26, 2023, state agency reviewing pediatrician Dana Schultz, M.D., and psychologist Cindy Matyi, Ph.D., conducted the reconsideration review. While they agreed with

the initial review that T.G.'s impairments did not functionally equal a listing, they differed in their specific domain findings. They concluded that T.G. had a "marked" limitation in attending and completing tasks (instead of a "less than marked" limitation); a "less than marked" limitation in acquiring and using information (instead of a marked limitation); a "less than marked" limitation for interacting and relating with others, moving about and manipulating objects, and caring for oneself (instead of no limitation); and no limitation in health and physical well-being. (*Compare* Tr. 78-79 *with* Tr. 70-71).

**B.    T.G.'s teachers**

In September 2022, T.G.'s second-grade teacher, Hannah Heindel, completed a teacher questionnaire. (Tr. 493-500). By that time in the school year, she had known T.G. for five weeks and indicated he was reading and writing at a first-grade level and was at a kindergarten level for math. (Tr. 493). In the domain at issue (acquiring and using information), Ms. Hendel mostly documented that T.G. had "slight" problems, however she noted an "obvious problem" in expressing ideas in written form and recalling and applying previously learned material, and a "serious problem" in reading and comprehending written material (the only serious problem indicated). (Tr. 494). In the domain of caring for himself, Ms. Hendel wrote, "[T.G.] struggles knowing strategies to handle frustrations. He tends to shut down and cry. [T.G.] does not attempt to ask for help when frustrated about school work." (Tr. 498).

In December 2023, Cari Shelly, a school intervention specialist, completed a questionnaire (Tr. 298-305). Ms. Shelly had known T.G. for 16 months and saw him twice a week for 15 minutes for reading support. (Tr. 298). She noted T.G. was in third grade but was at a second-grade level in reading writing, and math. (*Id.*). In the domain at issue (acquiring and using information), Ms.

Shelly indicated that T.G. either had "no problem" or a "slight" problem in various listed areas of functioning. (Tr. 299).

## V.    Testimonial evidence

At the hearing, T.G. was 9 years old and in third grade. (Tr. 43, 46). He organizes his own desk and keeps track of his own schoolbooks. (Tr. 47). He does his own homework (*id.*) but sometimes gets frustrated when doing it (Tr. 50). He can read street signs but cannot tell time. (Tr. 47). He plays soccer for fun at school and can ride a bike. (Tr. 48, 49). He plays video games online with two friends from school. (Tr. 45). He can bathe (though his mother checks he uses shampoo and not just conditioner), brush his teeth, pick out clothes, and tie his shoelaces on his own. (Tr. 49, 51, 52). Though he can use scissors, he cannot cut specific shapes. (Tr. 65).

His mother reported he is often distracted and will scroll through her phone, flip around, or kick his legs when he sits. (Tr. 52). At most, he can sit still for three minutes. (Tr. 59). Ms. Garcia reported T.G. was in speech therapy and showed improvement after calibrating his medication over the first year or two. (Tr. 53). Still, T.G. was held back a year and was reading at a second-grade level. (Tr. 53). One summer, they tested going without medication but he was hyperactive and ended up tripping and breaking his clavicle. (Tr. 55-56). Less severe falls were common. (Tr. 56). It was impossible to get him to read or write without the medication. (Tr. 56).

Ms. Garcia described her son as very wary and timid when he goes to new spaces. (Tr. 54). When she took him to a new baseball practice at a new gym, he sat and cried for 35 minutes. (Tr. 54). When he is frustrated from being unable to rollerblade or complete a math problem, he shuts down "like a blank wall" and does not speak. (Tr. 54).

T.G. had to repeat Pre-K and Kindergarten because he was behind in fine-motor skills, speech, spelling, letters, colors, and numbers. (Tr. 57). He attended occupational therapy to learn

7

to do ordinary tasks with which he struggles, like buttoning pants, tying shoes, or wiping himself. (Tr. 57-58). Since occupational therapy, he has been better at staying on-topic and redirecting himself when he goes off-topic. (Tr. 58). But he has since struggled to tie his shoes and wears shoes without laces. (Tr. 52, 58). He also struggles to follow instructions. (Tr. 58-59). While he can follow simple one- or two-step instructions, he struggles staying focused through three or more steps. (*Id.*). Ms. Garcia helps her son stay on-task when doing homework by cycling him from working on one or two problems, then playing for five minutes, and back. (Tr. 61).

### STANDARD FOR BENEFITS

An individual under the age of 18 is "considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(C)(i).

Because T.G. is under the age of 18, the familiar five-step sequential analysis does not apply. Instead, children's disability claims are evaluated under a three-step sequential analysis. *See* 20 C.F.R. § 416.924(c). At Step One, a child must not be engaged in "substantial gainful activity." *Id.* § 416.924(b). At Step Two, a child must have a medically determinable impairment or combination of medically determinable impairments that is "severe." *Id.* § 416.924(c). If the child does not have an impairment or combination of impairments that is severe, then the child is not disabled. *Id.* If the claimant has a severe impairment, then the ALJ proceeds to Step Three. *Id.*

At Step Three, the child's severe impairment must meet or medically equal the criteria of a relevant listing. *Id.* § 416.924(d). In deciding that issue, the ALJ must consider the combined effect

of all the claimant's medically determinable impairments, including those that are not severe. *Id.*
§§ 416.923, 416.924a(b)(4), 416.926a(a), (c). An impairment or combination of impairments
meets or medically equals a listing if the impairment or combination of impairments results in two
"marked" limitations or one "extreme" limitation over four functional area. *See* Listing 112.00,
20 C.F.R. Part 404, Subpart P, App'x 1, § 112.00(A)(2)(ii).

If the child's severe impairment does not meet or medically equal a relevant listing, then
the ALJ "will decide whether it results in limitations that functionally equal" a relevant listing.
20 C.F.R. § 416.924a(a). In determining whether an impairment functionally equals a listing, the
ALJ must assess the child's functioning in six domains: (1) acquiring and using information,
(2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and
manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *Id.*
§ 416.926(b); *see also Soc. Sec. Ruling (SSR) 09-1P*, 2009 WL 396031 (Feb. 17, 2009).[2] To
functionally equal the listings, the claimant's impairment(s) must result in "marked" limitations in
two domains of functioning or an "extreme" limitation in one domain. *Id.* § 416.926a(b)(1), (d).

## THE ALJ'S DECISION

The ALJ found T.G. was a school-age child within the meaning of 20 C.F.R. § 416.926a on
both the application date and on the date of the decision. (Tr. 18). At Step One, the ALJ
determined T.G. had not engaged in substantial gainful activity. (*Id.*). At Step Two, the ALJ
identified ADHD, speech delay, and fine-motor delay as severe impairments and cellulitis and
seasonal allergies as non-severe impairments. (*Id.*).

---

[2]    Although SSRs do not have the same force and effect as statutes or regulations,
they are "precedent[,] final opinions and orders[,] and statements of policy and interpretations"
adopted by the SSA and are "binding on all components of the SSA." 20 C.F.R. § 402.160(b)(1).

9

At Step Three, the ALJ first determined T.G.'s impairments did not meet or medically equal the criteria of a relevant mental disorder listing. (Tr. 19). The ALJ discussed Listing 112.11 (neurodevelopmental disorders) and found T.G. did not meet its requirements because he did not have one "extreme" limitation or two "marked" limitations over four areas of functioning. (*Id.*).

The ALJ then determined T.G.'s impairments did not "functionally equal" a relevant listing because he had only one "marked" limitation across six identified domains of functioning, short of the required one "extreme" limitation or two "marked" limitations across those six domains. (Tr. 19-32). The ALJ then concluded T.G. was not "disabled," as defined by the Social Security Act. (Tr. 32).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in

the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

Ms. Garcia argues the ALJ erred at Step Three in finding that T.G. has a "less than marked" limitation in the domain of acquiring and using information. (ECF #7 at PageID 858). Specifically, Ms. Garcia argues the ALJ did not explain how she considered contrary evidence such as (1) the assessment of T.G.'s teacher that T.G. had both a "serious" problem and an "obvious" problem in that area (terms that typically support marked limitations), (2) the various educational records that supported the teacher's assessment, and (3) the state agency reviewers' differing opinions on T.G.'s functioning. (*Id.* at PageID 860-63). Ms. Garcia does not challenge the ALJ's other findings.

The Commissioner responds that the ALJ discussed the teacher questionnaire and found it only "mostly persuasive," reviewed T.G.'s educational records that demonstrated he was also improving with medication, and discussed the state agency reviewers' findings and found the reconsideration review more persuasive. (ECF #9 at PageID 874-76). According to the Commissioner, Ms. Garcia's argument requires the court to impermissibly re-weigh the evidence. (*Id.* at PageID 876).

At Step Three, if a child claimant's severe impairment does not meet or medically equal a relevant listing, then the ALJ "will decide whether it results in limitations that functionally equal" a relevant listing. 20 C.F.R. § 416.924a(a). In determining whether an impairment functionally equals a listing, the ALJ must assess the child's functioning in six "domains," the first of which (and the one at issue here) is acquiring and using information. *Id.* § 416.926(b); *see also* SSR 09-1P, 2009 WL 396031, at *6.

12

The ALJ made the following findings in this domain:

Acquiring and using information concerns how well a child is able to acquire or learn information, and how well a child uses the information he has learned. This domain involves how well children perceive, think about, remember, and use information in all settings, which include daily activities at home, at school, and in the community.

Social Security rules that a school-age child (*i.e.*, a child age 6 to the attainment of age 12) without an impairment should be able to learn to read, write, and do math, and discuss history and science. The child will need to use these skills in academic situations to demonstrate what he has learned by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. The child will also need to use these skills in daily living situations at home and in the community (*e.g.*, reading street signs, telling time, and making change). The child should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing his own ideas, and by understanding and responding to the opinions of others.

Social Security regulation 20 CFR 416.926a(g)(3) and SSR 09-3p set forth some examples of limited functioning in this domain that children of different ages might have. The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods. In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain. Some examples of difficulty children could have in acquiring and using information are: (i) does not understand words about space, size, or time (*e.g.*, in/under, big/little, morning/night); (ii) cannot rhyme words or the sounds in words; (iii) has difficulty recalling important things learned in school yesterday; (iv) does not use language appropriate for age; (v) is not developing "readiness skills" the same as peers (*e.g.*, learning to count, reciting ABCs, scribbling); (vi) has difficulty comprehending written or oral directions; (vii) struggles with following simple instructions; (viii) has difficulty solving mathematics questions or computing arithmetic answers; or (ix) talks only in short, simple sentences, and has difficulty explaining what he means.

The claimant has less than marked limitation in acquiring and using information.

The claimant has a Full-Scale IQ of 96, which placed him in the average range of intelligence. A majority of his skills fell within the average range, but phonological processing and written expression were in the low average range. The claimant attended speech therapy beginning in 2021 because he was struggling with math and reading in school for which he demonstrated adequate progress as he was able to decode unknown words with mod cues, and he was doing well with memorizing sight words. In May 2023, the claimant was administered the Gray Oral Reading Tests-Fifth Edition (GORT-5) for evaluation of his current reading abilities for which the

claimant demonstrated age-appropriate reading skills with the sum of the scores, but below average in rate, accuracy, and comprehension. He had minimal difficulties with answering comprehension questions, intermittent difficulty with tier II and III words, and utilized decoding independently at times. The claimant's second grade teacher stated the claimant had a serious problem with reading and comprehending material; obvious problems expressing ideas in written forms and recalling and applying learned material; and the rest of the sub parts of acquiring and using information were identified as no or slight problems.

(Tr. 26) (underline and citations omitted).

Ms. Garcia argues the ALJ did not explain how T.G. had a less-than-marked limitation when his teacher identified both a "serious" problem and an "obvious" problem in the domain. (ECF #7 at PageID 860). She correctly points out that "courts have generally upheld domain findings that relate 'serious' problems in a domain to a marked impairment in that domain." (ECF #7 at PageID 861) (citing cases). At the same time, these cases do not require a finding that a claimant has a marked or extreme impairment when his teacher indicates a serious or obvious problem on the questionnaire. Notably the Social Security Program Operations Manual cautions against directly translating a teacher's ratings into an impairment's severity rating. *See* Soc. Sec. Admin. Program Operations Manual (POMS), POMS DI 2520.030(B)(5)-(6).

The ALJ did discuss the teacher questionnaire in her domain finding, writing T.G. had "a serious problem with reading and comprehending material; obvious problems expressing ideas in written forms and recalling and applying learned material; and the rest of the sub parts of acquiring and using information were identified as no or slight problems." (Tr. 26). Thus, this is not a case where the ALJ ignored or did not mention a line of evidence.

Rather, the ALJ stated her conclusion T.G. had a less-than-marked limitation, recited the evidence in support, and left it to the reader to connect the dots. A reader would not know whether the questionnaire supported or contradicted the other evidence mentioned by the ALJ.

14

Earlier in the decision, the ALJ found the questionnaire "relatively consistent with the evidence as a whole" and "mostly persuasive." (Tr. 25). But the ALJ did not explain whether "mostly persuasive" meant the questionnaire was not persuasive in this domain, or if the one obvious problem and two serious problems identified were outweighed by the other seven areas that had a slight or no problem (*see* Tr. 494) or simply outweighed by other evidence.

T.G.'s two serious problems and one obvious problem in acquiring and using information may support at least a marked limitation in that domain. *See, e.g.*, *Figueroa, o.b.o. E.A.R.F. v. Comm'r of Soc. Sec.*, No. 1:20-cv-1765, 2021 WL 6280389, at *13 (N.D. Ohio Dec. 13, 2021) (affirming finding of marked limitations based on evidence that included a teacher's opinion that claimant "has a serious problem" with frustration and coping skills) *report and recommendation adopted*, 2022 WL 44662 (N.D. Ohio Jan. 5, 2022). While the ALJ was not required to discuss every piece of evidence in the record, an ALJ nevertheless must sufficiently explain his or her reasoning so a reviewing court can conduct a meaningful review. *See Dukes v. Kijakazi*, No. 1:22-CV-00874-BMB, 2023 WL 11922736, at *11 (N.D. Ohio Apr. 21, 2023), *report and recommendation adopted*, 2023 WL 11922733 (N.D. Ohio May 16, 2023). The ALJ's lack of discussion here of how the evidence she cited fits together and supports a finding of a less-than-marked limitation makes it impossible for the court to determine whether that finding is supported by substantial evidence.

The need for an explained reasoning comes into focus when viewing the discussion of the domain as a whole. The ALJ described the domain of acquiring and using information and referenced nine examples in the regulations that describe difficulties that can support marked or extreme limitations in the domain. (Tr. 26). Two of which are "has difficulty recalling important things learned in school yesterday" and "talks only in short, simple sentences and has difficulty

15

explaining what he means." (Tr. 26) (quoting 20 C.F.R. § 416.926a(g)(3) and SSR 09-03p). The ALJ mentioned T.G. had obvious problems recalling and applying previously learned material and expressing ideas in written forms. (Tr. 26). These two problems relate to the two examples of limitations. Though the examples are only illustrative and do not necessarily describe a marked or extreme limitation, *see* 20 C.F.R. § 416.926a(g)(3), if the ALJ cites the examples and the teacher's ratings bear on those examples, the ALJ should explain how the domain conclusion flows from those examples.

It was all the more important for the ALJ to provide a reasoned explanation here because the other evidence—namely the two sets of state agency reviewers—does not show a clear consensus on T.G.'s limitations in the various domains. While both sets of state agency examiners agreed that T.G.'s impairments did not functionally equal a listing, they differed in their specific domain findings. The state agency examiners on initial review opined T.G. had a "marked" limitation for acquiring and using information; a "less than marked" limitation for attending and completing tasks, interacting and relating with others, and moving about and manipulating objects; and no limitations in caring for oneself and health and physical well-being. (Tr. 70-71). On reconsideration, the examiners opined T.G. had a "less than marked" limitation in acquiring and using information (instead of a "marked" limitation); a "marked" limitation in attending and completing tasks (instead of a "less than marked" limitation); a "less than marked" limitation for interacting and relating with others, moving about and manipulating objects, and caring for oneself (instead of no limitation); and no limitation in health and physical well-being. (Tr. 78-79). While the ALJ found the opinion on reconsideration more persuasive (Tr. 25), she did not explain

16

there or in the domain findings how she resolved the disagreement among the state agency reviewers to come to her conclusion.

Thus, because the reasoning behind the ALJ's decision making in the domain of acquiring and using information is not fully developed, I cannot determine whether substantial evidence supports that finding. *See Fleischer*, 774 F.Supp.2d at 877 (remanding where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Because a finding of a marked limitation here would warrant finding T.G. disabled, *see* 20 C.F.R. § 416.926a(a) (two marked limitations warrant a disability finding), the lack of a logical bridge here from the recited evidence to the domain finding is not harmless. Because remand is appropriate based on ALJ error, I recommend the District Court remand this matter for further proceedings. *See* 42 U.S.C.§ 405(g) (sentence four).

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** the matter for further proceedings.

Dated: April 24, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the**

proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge. Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).